# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| JENNIFER KOENIG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:16-cv-00556-NKL |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner ) | |
| Of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Jennifer Koenig appeals the Commissioner of Social Security's final decision denying her application for disability and disability insurance benefits, and supplemental security income. The decision is affirmed.

### I. Background

Koenig was born in 1985. She alleges she became disabled on April 1, 2010. Her date last insured was June 30, 2013. The Administrative Law Judge held a hearing on January 1, 2015 and denied her application on January 29, 2015. The Appeals Council denied her request for review on April 13, 2016. Koenig's appeal to this Court concerns mental limitations.

#### A.   Medical history

On December 23, 2010, Koenig went to the emergency room, stating that her boyfriend told her she had had a seizure. Koenig said she was not taking any medication for seizures but had in the past. After being examined, Koenig told the nurse she wanted to leave, so she was discharged.

On January 26, 2011, Koenig saw Henry Wisdom, D.O., at North Central Missouri Mental Health Center. She reported that she had been diagnosed with bipolar disorder and had

issues with seizures. The doctor prescribed Lamictal and hydroxyzine.

Koenig saw Dr. Wisdom again on February 23, 2011 for a supportive psychotherapy session. Dr. Wisdom noted that he was not "certain what [Koenig] want[ed]. On the one hand she said she wants to get her kids back, and on the other hand she wants to have the medication she was taking prior to going into a drug and alcohol facility[.]" Tr. 292. The doctor increased Koenig's medication dosages. He instructed her to continue therapy, as it seemed to help.

At a visit on March 23, 2011, Dr. Wisdom noted that Koenig was "able to concentrate." Tr. 293. She was well oriented and taking her medication. Dr. Wisdom also noted that Koenig was participating in therapy, "with good results." *Id*.

On April 20, 2011, Koenig saw Dr. Wisdom for another follow-up appointment. Dr. Wisdom suggested involvement in local and church activities and vocational rehabilitation.

Koenig next saw Dr. Wisdom on May 18, 2011. The doctor did not change Koenig's medications.

Koenig went to the emergency room on June 19, 2012 with an injury to her left foot. X-rays showed multiple fractures. The next day, Koenig had surgery.

Koenig went to the emergency room on August 15, 2012, reporting a seizure that had lasted for two minutes. She refused a drug test, but other tests indicated no cardiac event.

On December 7, 2012, Koenig saw Linda Lock at Truman Medical Center Behavioral Health for a psychological examination and to begin receiving outpatient services. She reported that she was required by Grundy County Family court to participate in mental health services. Koenig said she had stopped taking her psychotropic medication two years earlier and wanted to start them again. She said that since stopping them, she had headaches, anxiety, social anxiety, mood swings, and depression. Her mental status examination was largely normal, although Lock noted that Koenig's "attention and concentration [were] impaired as evidenced by [her]

2

stating that she cannot even watch TV and do something else at the same time." Tr. 357. Her memory was intact. The therapist recommended Koenig receive individual therapy and work with employment services.

On December 12, 2012, Koenig saw Trena Willich, a community support specialist, at Truman Medical Center. Koenig said that she did not have any income and wanted to work. Willich noted that Koenig was talkative and polite with a bright affect.

Koenig had a psychiatric evaluation by Douglas Burgess, M.D., a staff psychiatrist at Truman Medical Center, on December 18, 2012. Koenig reported that her mood was "up and down" and that she was irritable and snapped at people for minor things. Tr. 348. She also stated that her mood was "alright," but then said she had been depressed for the past 2 to 3 weeks. *Id.* Koenig stated that medication had not been effective in the past because she did not take it consistently, but she was interested in resuming. Koenig stated that she had used alcohol and drugs in the past, but had not used alcohol for four months, or drugs since entering treatment in 2009. Koenig's behavior was cooperative, she was well oriented, and she displayed intact memory. Dr. Burgess opined that Koenig's mood lability was largely due to situational stressors and assessed a GAF score of 38. He diagnosed bipolar disorder, major depressive disorder, alcohol dependence under partial remission, and methamphetamine dependence in remission by report. He prescribed sertraline and recommended psychotherapy.

On January 11, 2013, Koenig was discharged from the outpatient program, having "completed all of her outpatient treatment goals." Tr. 366. The discharge summary noted that she had a stable transition plan and a stable relapse prevention plan.

On April 8, 2013, Koenig saw Jean Tadokoro, M.S.W., L.C.S.W., about substance abuse issues and in an effort to regain custody of her son. On April 10, 2013, Koenig began attending group therapy related to addiction recovery skills. Therapy continued several times a week

3

through early June of 2013, when Koenig had a positive drug test. Koenig said she would not comply with her revised treatment plan, so was discharged from the program.

On April 12, 2013, an x-ray of Koenig's left foot showed an old healed fracture of the left fourth and fifth metatarsal bones and post-operative changes, but was otherwise unremarkable.

On June 1, 2013, Koenig saw David Whitmer, M.D., at the Truman Medical Center Emergency Department. She described experiencing an episode in which she felt nauseated, sweaty, and like she was going to pass out. A physical examination was unremarkable and the workup was negative.

On June 26, 2013, Koenig saw a psychiatrist, Muhammad Farhan, M.D., at Truman Medical Center, stating that she was there for a medication refill. The doctor noted that Koenig was "able to make reasonable eye contact," was calm, and her memory was intact. Tr. 445. Her mental status examination was largely normal. Dr. Farhan's assessment was mood lability, irritability, anger outbursts, and anxiety. He diagnosed mood disorder, not otherwise specified, and amphetamine and alcohol dependence in remission, and assessed a GAF of 45-50. He renewed Koenig's medications.

Koenig saw Karlo Beltran, M.D., at Truman Medical Center on August 2, 2013 for psychiatric care. Koenig stated that her medications caused her to have increased anxiety and impaired her concentration. She said they made her "zombie like," so she stopped taking them. Tr. 448. Dr. Beltran renewed Koenig's prescriptions for Neurontin, hydroxyzine, and Zoloft, and added Risperdal, and discussed with her the importance of medication compliance. Tr. 453.

Koenig returned to Dr. Beltran on September 18, 2013, stating that she felt "better" and her medication "kept [her] stable." Tr. 454. She said her energy was better, her appetite was good, and she was able to focus well. The doctor assessed a GAF score of 55. Tr. 458. At an October 16, 2013 appointment, she said she felt good, she was able to focus well, and that the

4

medication was keeping her stable. Tr. 459. The doctor assessed a GAF score of 60. Tr. 463. At her November 6, 2013 appointment, she said she had been out of her medications for a week, could feel the difference, and wanted to be back on them. Tr. 465. Dr. Beltran renewed her prescriptions at each appointment and assessed a GAF of 60. Tr. 468.

At a December 2, 2013 appointment, Koenig told Dr. Beltran that felt "a little bit sick" and "overworked," but was doing "ok" with her medications. Tr. 470 and 474. Her psychiatric evaluation continued to be unremarkable. Dr. Beltran renewed her prescriptions, except Risperdal, due to concern that Koenig might be pregnant, and assessed a GAF score of 55. Tr. 474.

On January 21, 2014, Koenig told Dr. Beltran that she was feeling more nervous. Except for her "anxious" mood, her mental status examination was unremarkable. Tr. 479. The doctor adjusted her medication dosages, prescribed trazodone and prazosin for sleep, and assessed a GAF score of 55. Tr. 480.

Koenig told Dr. Beltran on February 18, 2014 that she felt irritable. Her mental status examination was unremarkable except for "anxious" mood. Tr. 485. Dr. Beltran discontinued prazosin and adjusted the Zoloft dosage. Koenig's symptoms and mental status exam were the same on March 25, 2014. Dr. Beltran adjusted the trazodone dosage, renewed the other prescriptions, and assessed a GAF score of 50. Tr. 486.

On April 5, 2014, Koenig went to the emergency room, reporting a possible seizure. She said she had approximately one seizure a year. Her physical examination was unremarkable. She refused labs or imaging, and asked to leave.

Koenig returned to Dr. Beltran on June 3, 2014. She reported feeling anxious and having difficulty focusing. She said she would be going to a private therapist. Her mental status examination was unremarkable. Dr. Beltran continued her Neurontin, Zoloft, and trazadone;

5

discontinued hydroxyzine; and stared Lamictal.

Koenig saw Patricia Caraballo-Osorio for a walk-in appointment for psychiatric care at Truman Medical Center on June 23, 2014. She reported that her medications had been stolen from her car and that she needed a refill.

Koenig saw Dr. Beltran on July 9, 2014. She said she felt "ok" and wanted to continue her current medication regimen. Tr. 560. She denied any seizures, nightmares, or flashbacks. Dr. Beltran increased her Lamictal dosage to twice a day.

In September 2, 2014, Koenig told Dr. Beltran she was pregnant, she was sleeping well, her energy was good, and she had no difficulty focusing. Due to the pregnancy, Dr. Beltran discontinued her medications, except Zoloft, which he decreased.

Koenig saw Dr. Beltran on October 1, 2014. She had had a miscarriage and agreed to restart Lamictal. She felt okay, but tired, and was able to focus well. She denied feeling depressed or having had any seizures.

On November 17, 2014, Koenig told Dr. Beltran she was doing "pretty good" and denied any significant side effects from medications. Tr. 525. She reported working as a security officer on a temporary basis. Dr. Beltran noted Koenig was able to focus well and was complying with her medication regimen. He renewed the prescription for Lamictal and assessed a GAF score of 60. Tr. 529.

### B. Koenig's hearing testimony

Koenig testified during a hearing before the ALJ on January 20, 2015. She said that she could not work due to bipolar disorder, which caused mood swings, anxiety, depression, and manic phases; learning problems; and her left foot injury. She has a ninth or tenth grade education, and is a certified nurse's aide. She has a driver license. Koenig testified that she could no longer work because she got tired throughout the day, did not get along with others, had

anxiety and seizures, and had difficulty being on her feet. She said she has trouble with writing and reading. Filling out paperwork and reading is frustrating due to comprehension difficulties. She cannot make change. Koenig testified that she had short-term memory problems and does not use her stove in case she forgets to turn it off. She has seizures about once a year.

Koenig has previously worked as a nurse's aide, a laborer and inspector at a hog farm, and a kitchen helper which involved preparing meals and cleaning up. She stated that since April 1, 2010, her alleged onset date of disability, she has worked at a security job at a stadium in Kansas City about three times a month, for four or five hours at a time. She sits by a door and directs foot traffic to other parts of the stadium.

C. **Expert opinions**

Raphael Smith, Psy. D., reviewed Koenig's records and prepared a Psychiatric Review Technique Form[1] in March 2013. In the section relating to concentration, persistence, and pace, Dr. Smith wrote that Koenig was "[m]oderately limited" in her ability to work in coordination with or in proximity to others without being distracted by them. Tr. 80. With respect to social interaction, Dr. Smith wrote that Koenig was "[m]oderately limited" in her ability to interact appropriately with the public, and her ability to get along with coworkers without distracting them or exhibiting behavioral extremes. Tr. 80-81. In the narrative portion of the PRTF, Dr. Smith explained that while Koenig "may have difficulty working in close contact with the public or others, she retains the ability to work in an environment which does not require close or frequent interpersonal contacts." Tr. 81. The ALJ noted that Dr. Smith was "a mental health specialist with specialized understanding of the Social Security Act programs and their

---

[1] The Psychiatric Review Technique Form is a standard document which generally must be completed when a claimant alleges a mental impairment. *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996) (citing *Pratt v. Sullivan,* 956 F.2d 830 (8th Cir. 1992)). The PRTF mirrors the listings for mental impairments set out in the Social Security regulations. *Id.* (citing 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A § 12.00).

7

evidentiary support requirements, which entitles his opinion to more weight." Tr. 19. Overall, the ALJ gave Dr. Smith's opinion "significant weight." Tr. 23.

A vocational expert, Kristine Skahan, testified at the hearing before the ALJ. The ALJ asked if any occupation existed in significant numbers for a hypothetical person of Koenig's age, education, and work experience who could stand and walk for four hours and sit for eight hours of an eight-hour workday; understand, remember, and carry out instructions and tasks at an SVP 3 level; can have occasional contact with coworkers, supervisors, and the general public, but should not work with the public as a primary duty; could have no teamwork job duties; can receive only oral instructions; cannot make change; could have no work at unprotected heights or around dangerous machinery; could not operate a motorized vehicle; and could have no concentrated exposure to flashing lights, high humidity, or high temperatures. Skahan testified that the individual could work as a photocopy machine operator (SVP 2 level, unskilled, light); document preparer (SVP 2 level, unskilled, sedentary); or final assembler of optical goods (SVP 2 level, unskilled, sedentary). Tr. 57.[2] All three jobs existed in significant numbers in the state and national economies. On cross examination, Skahan testified that if the same hypothetical individual was also unable to stay on task for up to two and a half hours per day,

---

[2] A job's SVP level, or Specific Vocational Preparation level, denotes the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance[.]" DICTIONARY OF OCCUPATIONAL TITLES, app. C, 1991 WL 688702. The SVP 2 level requires anything beyond short demonstration up to and including one month of training; SVP 3 level requires between one and three months; and SVP 4 level requires between three and six months. *Id.* The DOT lists an SVP level for each occupation.

A job's SVP level corresponds to its skill level. *See* 20 CFR §§ 404.1568 and 416.968. SVP levels of 1-2 correspond to "unskilled" work; SVP of levels of 3-4 correspond to "semi-skilled" work; and SVP levels of 5-9 correspond to "skilled" work. SSR 00–4P, 2000 WL 1898704, at *3 (Dec. 4, 2000).

Regulations also define skill level. *See* 20 CFR §§ 404.1568(a)-(c) and 416.968(a)-(c). "Unskilled "work requires little or no judgment to perform simple duties that can be learned on the job in a short amount of time, and "semi-skilled" work requires "some skills but does not require doing more complex work duties," while "skilled" work requires the use of "judgment…[and] may" involve a "high level of complexity[.]"

then there would be no competitive employment available to her.

Skahan also testified regarding the exertion and skill level of Koenig's past relevant work: nurse's aide is SVP 4 level, semi-skilled, medium; farm laborer is SVP 2 level, unskilled, heavy; inspector is SVP 2 level, unskilled, light; and kitchen helper is SVP 2 level, unskilled, medium. Tr. 56.

### D. The ALJ's decision

The ALJ found that during the relevant period, Koenig had severe impairments of affective disorder, status post left foot fracture and surgery, and history of seizures. Koenig did not claim to meet any Listings, and the ALJ did not find that she met any.

The ALJ found Koenig has the residual functional capacity (RFC):

> [T]o stand or walk for 4 hours in an 8-hour workday and can sit for 8 hours in an 8-hour workday. She can understand, remember and carry out instructions and tasks at an SVP 3 level. She can have occasional contact with coworkers, supervisors, and the general public. Working with the general public should not be a primary job duty. She should not perform teamwork types of job duties. She would need oral instructions only. She could not do jobs that required making change such as cashier. She cannot work at unprotected heights or around dangerous machinery. She should not operate motorized vehicles. She should not have concentrated exposure to flashing lights, high humidity, or high temperatures.

Tr. 20. The ALJ concluded Koenig was not capable of performing past relevant work as a nurse's aide, farm laborer, inspector, or kitchen helper. However, the ALJ concluded there were jobs in significant numbers in the national economy that Koenig could perform, including photocopy machine operator, document preparer, or final assembler of optical goods. Accordingly, Koenig was denied benefits.

## II. Discussion

Koenig argues that in determining her RFC, the ALJ failed to adequately account for her

9

moderate limitations in maintaining concentration, persistence, or pace. In particular, Koenig complains that the ALJ "focused on nothing more than the skill level—or SVP—of the job," which, she argues, does not address her mental limitations. Doc. 8, p. 11. Therefore, she concludes, the RFC is not based on substantial evidence. She asks for reversal and remand for further proceedings.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015). For the reasons discussed below, the Court concludes that the RFC determination is supported by substantial evidence on the whole record, and rejects Koenig's arguments.

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of her limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217

(8th Cir. 2001).

Koenig's medical records show that when she was medication compliant and participated in psychotherapy, her mental health symptoms improved. With medication, she frequently reported to providers that she was doing okay, felt better, and could focus. Her providers also noted that when she was medicated, her mental status exams were unremarkable, she was stable, she could concentrate and focus, and her memory was intact. They also noted that psychotherapy helped her symptoms. "Impairments that are controllable with treatment do not support a finding of total disability." *Pepper ex rel. Gardner v. Barnhart,* 342 F.3d 853, 855 (8th Cir. 2003) (internal quotations and citations omitted).

The ALJ considered evidence in the record that providers from time to time gave Koenig GAF scores below 50.[3] However, the ALJ explained that these scores were generally assessed during periods when Koenig was abusing drugs, or else were inconsistent with contemporaneous treatment notes and therefore did not reflect the severe kinds of problems that a GAF below 50 might otherwise suggest. *See, e.g.,* Tr. 293 and 297.[4] One psychiatrist who assessed a GAF of 38 in December 2012 also noted that Koenig's mood lability was largely due to situational stressors. The record further reflects that Koenig was generally assessed with GAF scores above 50, indicating moderate symptoms, when she was compliant with treatment. Accordingly, on the whole record, the GAF scores support the ALJ's finding. *See Henderson v. Berryhill*, 2017 WL 628300, at *4 (W.D. Ark. Feb. 15, 2017) (ALJ's observation that claimant's mental health

---

[3] A GAF score of 41 to 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 35 (4th ed.). A GAF score of 51 to 60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attack) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.*

[4] A 3/23/2011 session summary form signed by Dr. Wisdom includes a GAF score of 44. Tr. 297. But the doctor's treatment notes state that Koenig was able to concentrate, well-oriented, taking her medication, and participating in therapy "with good results." Tr. 293.

11

symptoms improved with therapy, and that her GAF scores increased from 50 to 60 after treatment, lent support to the ALJ's conclusion that the claimant was not disabled).

Further, none of Koenig's treating providers opined that she had any mental health limitations. Dr. Smith, a mental health specialist with specialized understanding of the Social Security Act programs, reviewed Koenig's medical records and offered the only expert opinion in evidence concerning mental limitations. The ALJ gave Dr. Smith's opinion significant weight and Koenig does not dispute it. Specifically, with respect to concentration, persistence, and pace, Dr. Smith opined only that Koenig was moderately limited in her ability to work in coordination with, or in proximity to, others without being distracted by them. With respect to social interaction, Dr. Smith similarly concluded that Koenig was moderately limited in her ability to interact appropriately with the public, and her ability to get along with coworkers without distracting them or exhibiting behavioral extremes. In the narrative portion of the PRTF, Dr. Smith explained that while Koenig "may have difficulty working in close contact with the public or others, she retains the ability to work in an environment which does not require close or frequent interpersonal contacts." Tr. 81. In short, Dr. Smith concluded that Koenig can work and his opinion with respect to her limitations was narrowly drawn. The record contains no expert medical opinion to support the conclusion that Koenig is totally disabled due to mental health limitations.

The ALJ also considered Koenig's own description of her symptoms and concluded that her allegations were not entirely credible. Koenig testified that she avoided social interactions and had difficulty making change, which the ALJ accounted for. However, the ALJ noted that her claims of memory problems and concentration difficulties were inconsistent with her reports to her doctors over time that she was doing well and could focus when she was medication compliant. "Subjective complaints may be discounted if the evidence as a whole is not

12

consistent with the claimant's testimony." *Cox v. Barnhart,* 471 F.3d 902, 907 (8th Cir. 2006). The ALJ noted Koenig had not been compliant with treatment for mental impairments for a period of years. An ALJ may properly consider the claimant's noncompliance with a treating physician's directions, *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001), including failing to take prescription medications, *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999). *See also Banks v. Massanari*, 258 F.3d 820, 825-26 (8th Cir. 2001) (ALJ properly discounted claimant's complaints of disabling depression as inconsistent with daily activities and failure to seek additional psychiatric treatment). The ALJ further noted that Koenig had worked a security job after her alleged disability onset date. Work performed during any period in which a claimant alleges disability generally demonstrates an ability to perform substantial gainful activity. *Goff v. Barnhart,* 421 F.3d 785, 792 (8th Cir. 2005); 20 C.F.R. § 416.971. In addition, although Koenig argues that she cannot pay attention for two and a half hours, Doc. 8, p. 14, or even for two minutes, *id.*, p. 15, she testified that she performs security jobs lasting four to five hours at a time, Tr. 40. Substantial evidence on the whole record supports the ALJ's assessment of Koenig's allegations concerning her symptoms and limitations.

Koenig takes issue with the ALJ's express reference to SVP 3 level work in the RFC, arguing that the ALJ "focused on nothing more than the skill level—or SVP—of the job," which, she argues, does not address her mental limitations. Doc. 8, p. 11. An ALJ may account for deficiencies in concentration, persistence, or pace by limiting a claimant to jobs at a particular SVP level. *See, e.g., Vigil v. Colvin,* 805 F.3d 1199, 1203 (10th Cir. 2015) ("The ALJ found at step three that Vigil has moderate difficulties in concentration, persistence, and pace in social functioning. The ALJ took these difficulties into account in formulating [the] RFC by limiting the skill level of his work with an SVP one or two."). As noted above, SVP 3 level work corresponds to semi-skilled work, or work that requires some skill, but does not require doing

13

complex work duties. SVP 3 level work is therefore consistent with deficiencies in concentration, persistence, or pace. However, the RFC in this case also expressly limited Koenig to only occasional contact with coworkers, supervisors, and the general public; only oral instructions; no teamwork types of job duties; not working with the general public as a primary job duty; and no jobs that required making change such as cashier. As the expert evidence indicated, Koenig's deficiencies in concentration, persistence, and pace are narrow, and specifically concern her inability to interact with others without being distracted. The ALJ also accounted for evidence that Koenig avoided social interactions and had difficulty making change. In other words, the RFC includes specific limitations relating to the types deficiencies that are supported by substantial evidence on the whole record. Accordingly, the RFC's reference to an SVP level does not render the RFC unsupported.[5]

This case is not like *Newton v. Chater,* 92 F.3d 688 (8th Cir. 1996), upon which Koenig principally relies. In *Newton,* the Eighth Circuit held that a "limitation to simple jobs" in the RFC did not adequately account for the claimant's deficiencies in concentration, persistence, and pace, because "simple jobs" did not necessarily address issues with pace. *Id.* at pp. 694-95. Here, and as discussed above, the RFC includes specific limitations relating to Koenig's specific deficiencies. Therefore, *Newton* does not change the analysis.

Koenig also briefly notes that in assessing mental impairments, an ALJ must use the special Psychiatric Review Technique described in 20 C.F.R. §§ 404.1520a and 416.920a.

---

[5] Notwithstanding the RFC's reference to SVP 3 level jobs, all the jobs that the ALJ specifically identified in the decision as ones that Koenig could perform—photocopy machine operator, document preparer, or final assembler of optical goods—were SVP 2 level, unskilled jobs. As noted above, SVP 1 and 2 correlate to unskilled work, or work that requires little or no judgment in order to perform simple duties. To the extent Koenig suggests an SVP level of 3 is too high in relation to her deficiencies in concentration, persistence, or pace, she would not be entitled to reversal because the ALJ has already identified jobs at the lowest skill level. *See Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (reversal requires prejudicial error).

Doc. 8, p. 10. *See also* SSR 96-8p,1996 WL 374184, at *4 (Soc. Sec. Admin. July 2, 1996) (when evaluating the mental components of the RFC, the ALJ must consider "the various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF."). The ALJ did so here, considering the PRTF prepared by Dr. Smith and evaluating the paragraph B and C criteria in the decision. Tr. 19.

The foregoing demonstrates that the RFC determination is supported by substantial evidence on the whole record, including medical evidence. It was Koenig's burden to prove she had a more restrictive RFC and she failed to bear it.

### III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:   March 3, 2017
Jefferson City, Missouri